IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CONAN DOYLE ESTATE LTD.

    *Plaintiff,*

v.                               Case No. 1:20-cv-00610

NANCY SPRINGER, PENGUIN
RANDOM HOUSE LLC, LEGENDARY
PICTURES PRODUCTIONS, LLC,
NETFLIX, INC., PCMA MANAGEMENT
AND PRODUCTIONS LLC, EH PRODUCTIONS
UK LTD., JACK THORNE, and HARRY BRADBEER

    *Defendants.*

## FIRST AMENDED COMPLAINT FOR INJUNCTION AND DAMAGES

Plaintiff Conan Doyle Estate Ltd. (Conan Doyle Estate) alleges as follows for its First Amended Complaint for Injunction and Damages against defendants Nancy Springer, Penguin Random House LLC, Legendary Pictures Productions, LLC, Netflix, Inc., PCMA Management and Productions LLC, EH Productions UK Ltd., Jack Thorne, and Harry Bradbeer.

## INTRODUCTION

1.    This action for copyright infringement arises from defendants' unauthorized copying of original creative expression by Sir Arthur Conan Doyle (Conan Doyle) in copyrighted Sherlock Holmes stories.

2.    Between 1923 and 1927, Conan Doyle wrote his last ten original stories about Sherlock Holmes, collected in the 1927 book *The Case-Book of Sherlock Holmes*. The Copyright Act provides a term of protection for each story of 95 years from publication, resulting in copyright terms for the stories ending between December 31, 2018 and December 31, 2022. For

1

those of the stories whose copyright terms have ended, this action is brought within the three-year limitations period for infringement. These stories are collectively referred to herein as the "Copyrighted Stories."

3.      Conan Doyle created Sherlock Holmes and Dr. John Watson in his 1887 novella *A Study in Scarlet*, and the world is free to use and adapt the characters as Conan Doyle created and developed them in his public domain Sherlock Holmes stories. But in his ten last stories Conan Doyle did not merely copy and re-use his existing Holmes and Watson characters. After he wrote the stories now in the public domain and before writing the Copyrighted Stories, World War I occurred. Conan Doyle lost his brother and his son in the Great War. When Conan Doyle returned to writing Sherlock Holmes stories after the war, he created significant new character traits for Holmes and Watson in the Copyrighted Stories. These new characteristics have been licensed for use in every major new Sherlock Holmes story, and are a substantial part of the characters known to movie-goers and television watchers around the world.

4.      The defendants engaged in discussion to license these creative elements, but refused to do anything other than credit Conan Doyle—apparently taking the position these original story elements by one of the world's most creative authors can be infringed simply because the copyrights are in their last years.

## PARTIES AND JURISDICTION

5.      Plaintiff Conan Doyle Estate Ltd. is a United Kingdom corporation formed by the family of Sir Arthur Conan Doyle. After passage of the 1976 Copyright Act, Dame Jean Conan Doyle, Sir Arthur's last surviving child, exercised her rights under 17 U.S.C. § 304 to recover the copyrights in her late father's works. Copies of her notices of termination were

recorded in the United States Copyright Office. The Conan Doyle Estate has since authorized every major film and television adaptation of Conan Doyle's work, and has worked with authors and other creative individuals to release new Holmes stories in various media and to make Conan Doyle's works available to adults and children around the world.

6.      Upon information and belief, defendant Nancy Springer is a resident of Florida. She is the author of the six *Enola Holmes Mysteries* and has sold and distributed the books in all fifty states including New Mexico. Ms. Springer has worked with other defendants to develop a movie or series of movies based on her own and Conan Doyle's work. The first such movie is titled *Enola Holmes* and was released in New Mexico and other states around the country.

7.      Upon information and belief, defendant Penguin Random House LLC is a Delaware limited liability company with its principal place of business in New York. Penguin Random House or its predecessors in interest began publishing the *Enola Holmes Mysteries* in 2006 and on information and belief have sold and distributed the books in all fifty states including New Mexico.

8.      Upon information and belief, Legendary Pictures Productions, LLC (Legendary) is a California film production and media company. Legendary produces and distributes films throughout the United States, including in New Mexico, and has produced, released, and distributed *Enola Holmes* nationwide, in partnership with Netflix, Inc. and other defendants.

9.      Upon information and belief, Netflix, Inc. (Netflix) is a Delaware corporation engaged in film production and distribution. Upon information and belief Netflix acquired global distribution rights, excluding China, for the film *Enola Holmes*, and is distributing the infringing movie in New Mexico.

10.     Upon information and belief, defendant PCMA Management and Productions LLC (PCMA) is a Georgia limited liability company which co-produced the film *Enola Holmes* and has released and distributed the movie nationwide including in New Mexico.

11.     Upon information and belief, EH Productions UK Ltd. (EH Productions) is a United Kingdom company which has produced many films distributed in New Mexico, and that co-produced *Enola Holmes* and has released and distributed the movie nationwide, including in New Mexico.

12.     Upon information and belief, defendant Jack Thorne is a resident of London, England and has directed or been the screenwriter for dozens of films and television series released in the United States, including in New Mexico. He is the screenwriter for *Enola Holmes*.

13.     Upon information and belief, defendant Harry Bradbeer is a resident of London, England and has directed, produced, and acted in several television series released nationwide, including in New Mexico. He directed *Enola Holmes*.

14.     All defendants copied protected original authorship from Conan Doyle's Copyrighted Stories.

15.     Defendants Nancy Springer and Penguin Random House LLC are referred to collectively herein as the "Book Defendants." Defendants Legendary, Netflix, PCMA, EH Productions, Jack Thorne, and Harry Bradbeer are collectively referred to as the "Film Defendants." Book Defendants and Film Defendants are at times collectively referred to herein as defendants.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because all defendants are subject to personal jurisdiction in this district.

## GENERAL ALLEGATIONS

### The Public Domain Sherlock Holmes Stories

17.     Between 1887 and 1927, Conan Doyle wrote sixty works featuring Sherlock

Holmes and Dr. Watson. Fifty of these works are in the public domain and beyond the copyright

infringement limitations period.

18.     Ten original Holmes stories by Conan Doyle, the Copyrighted Stories, remain

under copyright protection or are within the statutory limitations period for infringement:

> "The Adventure of Shoscombe Old Place" (1927)
> "The Adventure of the Veiled Lodger" (1927);
> "The Adventure of the Retired Colourman" (1926);
> "The Adventure of the Lion's Mane" (1926);
> "The Adventure of the Three Gables" (1926);
> "The Adventure of the Blanched Soldier" (1926);
> "The Adventure of the Illustrious Client" (1924);
> "The Adventure of the Three Garridebs" (1924);
> "The Adventure of the Sussex Vampire" (1924); and
> "The Adventure of the Creeping Man" (1923).

19.     While Sherlock Holmes is famous for his great powers of observation and logic,

he is almost as famous for being aloof and unemotional. In one public domain story Watson

describes him as follows:

> During my long and intimate acquaintance with Mr. Sherlock Holmes I
> had never heard him refer to his relations, and hardly ever to his own
> early life. This reticence upon his part had increased the somewhat
> inhuman effect which he produced upon me, until sometimes I found
> myself regarding him as an isolated phenomenon, a brain without a
> heart, as deficient in human sympathy as he was pre-eminent in
> intelligence. His aversion to women and his disinclination to form new
> friendships were both typical of his unemotional character . . . . ("The
> Greek Interpreter.")

20.     His closest companion, Watson, revered Holmes and was generous in his admiration. But to Holmes, Watson was utilitarian—to be employed when useful, then set aside. Holmes did not treat Watson with warmth. Holmes told him, "You have a grand gift for silence, Watson. It makes you quite invaluable as a companion." ("The Man with the Twisted Lip.") Holmes did not even congratulate Watson when Watson told Holmes he was going to marry Holmes's client Mary Morstan:

> He gave a most dismal groan. "I feared as much," said he. "I really cannot congratulate you."
>
> I was a little hurt. "Have you any reason to be dissatisfied with my choice?" I asked.
>
> "Not at all. I think she is one of the most charming young ladies I ever met, and might have been most useful in such work as we have been doing. She had a decided genius that way: witness the way in which she preserved that Agra plan from all the other papers of her father. But love is an emotional thing, and whatever is emotional is opposed to that true cold reason which I place above all things. I should never marry myself, lest I bias my judgment." (*The Sign of Four*)

**<u>The Copyrighted Stories</u>**

21.     All of this changed. After the stories that are now in the public domain, and before the Copyrighted Stories, the Great War happened. In World War I Conan Doyle lost his eldest son, Arthur Alleyne Kingsley. Four months later he lost his brother, Brigadier-general Innes Doyle. When Conan Doyle came back to Holmes in the Copyrighted Stories between 1923 and 1927, it was no longer enough that the Holmes character was the most brilliant rational and analytical mind. Holmes needed to be human. The character needed to develop human connection and empathy.

22.     Conan Doyle made the surprising artistic decision to have his most famous character—known around the world as a brain without a heart—develop into a character with a heart. Holmes became warmer. He became capable of friendship. He could express emotion. He began to respect women.

23.     His relationship to Watson changed from that of a master and assistant to one of genuine friendship. Watson became more than just a tool for Holmes to use. He became a partner. The friendship of Holmes and Watson became one of the most important and well-known in modern literature. It is the Copyrighted Stories that create the most important parts of this friendship.

24.     In the Copyrighted Story "The Lion's Mane," Conan Doyle creates new character attributes for Holmes, placing a woman at the center of the story and having Holmes react with warmth and emotion to her—quite unlike Holmes's famous indifference, or even actual aversion to women in public domain stories.

25.     In "Blanched Soldier," when Watson marries a second time and moves out of Baker Street, Holmes describes the emotional impact this had upon him, calling Watson's remarriage "the only selfish action which I can recall in our association. I was alone." Holmes's new ability to express feeling results in a complex series of original creative elements Conan Doyle expressed in the Copyrighted Stories.

26.     Conan Doyle created other original additions to Holmes's and Watson's characters, as well as new settings, plots, and other story elements in the Copyrighted Stories. The following are examples:

- Holmes develops a knowledge of medicine and employs it in Dr. Watson's absence, whereas previously he had relied on Dr. Watson for guidance where medical issues arose.

- Holmes and Watson embrace modern technologies and use them in detective work for the first time in Copyrighted Stories.

- The Copyrighted Stories depict Watson marrying a second time during his association with Holmes.

- Holmes changes from one who cares little for dogs to someone who has great interest in them.

The Copyrighted Stories contain other original authorship, as one would expect from one of the language's most inventive and original writers.

**Copyright Infringement in the _Enola Holmes Mysteries_**

27.      Defendant Springer wrote the _Enola Holmes Mysteries_, a series of novels, using Sherlock Holmes, Dr. Watson, and other characters, settings, plots and story elements from both public domain and Copyrighted Stories. Springer created the character Enola Holmes, a fictional younger sister of Sherlock Holmes, but borrowed Sherlock Holmes, Mycroft Holmes, and Dr. John Watson directly from Conan Doyle, including from his Copyrighted Stories.

28.      The six _Enola Holmes_ novels are:

- _The Case of the Missing Marquess_ (2006);
- _The Case of the Left-Handed Lady_ (2007);
- _The Case of the Bizarre Bouquets_ (2008);
- _The Case of the Peculiar Pink Fan_ (2008);
- _The Case of the Cryptic Crinoline_ (2009); and
- _The Case of the Gypsy Goodbye_ (2010).

29.      In addition to using the public domain Holmes and Watson characters, the novels copy Conan Doyle's original additions in the Copyrighted Stories. Among other copied

elements, the Springer novels make extensive infringing use of Conan Doyle's transformation of Holmes from cold and critical to warm, respectful, and kind in his relationships.

30.     Springer places Enola Holmes at the center of the novels and has Holmes initially treat her coolly, then change to respond to her with warmth and kindness.

31.     In his copyrighted 1924 story "The Three Garridebs," Conan Doyle created this new emotion and friendship in Sherlock Holmes. When the story's villain fires a gun and Watson is hit, Holmes says:

> "You're not hurt, Watson? For God's sake, say that you are not hurt!"
>
> It was worth a wound—it was worth many wounds—to know the depth of loyalty and love which lay behind that cold mask. The clear, hard eyes were dimmed for a moment, and the firm lips were shaking. For the one and only time I caught a glimpse of a great heart as well as a great brain. All my years of humble but single-minded service culminated in that moment of revelation.

32.     In Springer's *Case of the Left-Handed Lady*, the disappearance of Holmes's mother and Enola causes Holmes to despair. Dr. Watson decides to seek help from another detective named Dr. Ragostin, and meets with Dr. Ragostin's assistant, who is actually the disguised Enola. Watson tells Enola that Sherlock is distraught and not eating or sleeping as a result of her disappearance. Enola thinks: "My brother, paragon of the coldly logical mind, distraught? Unable to eat or sleep? I had no idea that he was capable of such depth of feeling. Least of all about me."

33.     Springer makes extensive use of Conan Doyle's original authorship in Copyrighted Stories. For example, in Springer's *Case of the Gypsy Goodbye*, Holmes wants to celebrate Enola's birthday with her brothers. Enola notes neither of them "had ever concerned

himself with my birthday," but this time Sherlock insists they should be together and expresses his deep brotherly love for her.

34.     Springer also copies Sherlock Holmes's warm friendship with Watson from the Copyrighted Stories. In Springer's *The Case of the Bizarre Bouquets*, Watson goes missing and is presumed dead or kidnapped. When Sherlock begins to investigate he has the following exchange with Watson's wife:

> "But . . . John would not have left . . ." Mrs. Watson's quiet voice struggled against tears.
>
> "Exactly." My brother's voice also repressed strong emotion—my heart swelled when I heard such controlled anguish in his words. "No doctor, least of all Watson, would ever willingly be separated from his black bag."
> . . .
> "It is true, logic suggests no reason why murder might not have taken place." My brother's voice had tightened to the breaking point.

35.     Nowhere in the public domain stories does Holmes express such emotion about the well-being of his companion John Watson. This friendship was not created by Springer in the *Enola Holmes Mysteries*. It was created in the Copyrighted Stories and copied by Springer.

36.     The Copyrighted Stories contain much other original authorship copied throughout Springer's six novels.

**The *Enola Holmes* Film**

37.     The Film Defendants have adapted, directed, produced, released, and distributed a film called *Enola Holmes* based on the *Enola Holmes Mysteries*. The producers of *Enola Holmes* represent that the motion picture is based on Defendant Springer's *Enola Holmes Mysteries*. In a Netflix press release of April 21, 2020, Netflix states the film is "based on Nancy Springer's . . . book series."

38.     As a derivative of the *Enola Holmes Mysteries* it copies the same elements from Conan Doyle's Copyrighted Stories that Defendant Springer copied in her book series, including the characters as Springer developed and copied them.

39.     All defendants have had continuous unfettered access to the Copyrighted Stories themselves and to countless versions and adaptations of the Copyrighted Stories in every possible medium, from the fourteen films from 1939 to 1946 starring Basil Rathbone and Nigel Bruce to the 1980s British television series starring Jeremy Brett to Hartswood Films' series starring Benedict Cumberbatch and Warner Brothers' continuing *Sherlock Holmes* franchise. The Holmes and Watson characters stamped in the public mind are the Holmes and Watson characters of the Copyrighted Stories.

40.     The Book Defendants have publicly stated that when Springer "was growing up, her mother had the complete works of Sir Arthur Conan Doyle. These ten volumes in their brown cloth binding were a constant presence in her childhood, and she recalls reading and rereading them over a period of years until she could find no more Sherlock Holmes stories to memorize."

41.     In addition to Defendant Springer, the movie's creators have grown up and lived their entire professional lives with full access to the Copyrighted Stories. The *Enola Holmes Mysteries* and movie contain substantial similarity to protected elements of the Copyrighted Stories.

**The Conan Doyle Estate's Trademarks**

42.     The Conan Doyle Estate has extensively used and licensed HOLMES, MR. HOLMES, SHERLOCK HOLMES, and HOLMES AND WATSON as trademarks (the

HOLMES family of trademarks). The Conan Doyle Estate developed these trademark rights long before the activities of defendants in filming the motion picture *Enola Holmes*, and the HOLMES family of trademarks serve as powerful indicators of goods and services sponsored by or affiliated with the Conan Doyle Estate.

43.     The Conan Doyle Estate owns several United States trademark registrations for SHERLOCK HOLMES, including:

- SHERLOCK HOLMES®, Reg. No. 4,690,745 for cultural, educational, and entertainment exhibitions



-   ®, Reg. No. 5396601 for books and short stories in the field of detective fiction;

- SHERLOCK HOLMES®, Reg. No. 4313984 for electronic gaming machines; and

- SHERLOCK HOLMES®, Reg. No. 5906240 for clothing.

44.     The Conan Doyle Estate has developed common law trademark rights in the HOLMES family of trademarks for motion picture and television series through use and licensing of its marks for those goods and services. Because of widespread use in connection with Estate-licensed motion pictures and television series, the HOLMES family of trademarks are strong source identifiers of the Conan Doyle Estate.

45.     Film Defendants' use of ENOLA HOLMES in connection with a motion picture creates a likelihood of confusion as to whether the Conan Doyle Estate sponsors, endorses, or is

otherwise affiliated with the motion picture, thereby unfairly trading on the Conan Doyle Estate's goodwill.

**Defendants Refuse to Acknowledge Their Obvious Copying and
Film Defendants' Misuse of the Conan Doyle Estate's Trademark**

46.     Neither Nancy Springer nor her publisher or the film producers requested permission to copy the original authorship in the Copyrighted Stories, apparently believing that because the public domain materials about Holmes and Watson and their fictional world are free for public use, and because the Copyrighted Stories are in the final years of protection, that the creativity of one of the world's most original authors could be pirated without consequence.

47.     The Conan Doyle Estate informed Penguin Random House, Springer, and the movie producers of the original authorship being copied in Springer's novels and defendants' movie.

48.     The Conan Doyle Estate repeatedly and at length described the protected authorship being copied by defendants—who are sophisticated owners and enforcers of copyrights themselves. Defendants eventually offered to credit the Conan Doyle Estate, but refused to share any of the financial gain they would reap from Conan Doyle's protected authorship. Developing credible and significant additions to public domain characters is highly creative work. Writers are routinely paid seven figures for writing derivative scripts based on characters created by others. Defendants' copying and distribution of Conan Doyle's protected additions in the Copyrighted Stories has been and continues to be willful.

49.     In deciding to willfully infringe, defendants disregard directly applicable precedent holding that incremental original additions to public domain characters are protected by copyright. Defendants' position, if accepted, would mean their own creative additions to the

Holmes and Watson fictional world would be without copyright protection. But defendants claim their creative additions to Holmes and Watson are worthy of protection while seeking to deny that protection for the creative additions of Arthur Conan Doyle himself.

**COUNT I**
**COPYRIGHT INFRINGEMENT**
**(Against All Defendants)**

50.     The Conan Doyle Estate incorporates by reference all of the foregoing allegations.

51.     The Conan Doyle Estate owns registered copyrights in the Copyrighted Stories.

52.     The Copyrighted Stories contain highly original creative authorship protected by copyright.

53.     Defendants had access to and were aware of protected elements in the Copyrighted Stories, which have been widely published since 1924 and have been adapted and distributed in many media for decades.

54.     Defendants have copied, created derivative works from, and distributed protected expression from the Copyrighted Stories.

55.     Upon information and belief, all copies of the Copyrighted Stories to which defendants had access contained copyright notices. Because of these copyright notices, and other information available to defendants, defendants knew or should have known the Copyrighted Stories were protected by copyright laws.

56.     Defendants were never authorized to copy protected elements from the Copyrighted Stories.

57.     Defendants willfully infringed the copyrights in the Copyrighted Stories by reproducing highly original fictional expression from these copyrighted works in the six *Enola Holmes Mysteries* and the film *Enola Holmes*, creating unauthorized derivative works using that protected expression, and distributing and threatening to further distribute unauthorized works.

58.     Defendants have distributed, displayed, and performed the infringing film *Enola Holmes* in a streaming release of *Enola Holmes* nationwide and this distribution, display, and performance is ongoing.

59.     Defendants' actions violate the Conan Doyle Estate's exclusive rights under 17 U.S.C. § 106 and constitute willful infringement of the Conan Doyle Estate's copyrights in the Copyrighted Stories. Defendants' past and continuing copying and threatened future distribution of the Enola Holmes books and film constitutes willful, deliberate, and ongoing infringement of the Conan Doyle Estate's copyrights, causing actual and continuing damage and irreparable harm to the Conan Doyle Estate.

60.     The Conan Doyle Estate has no adequate remedy at law.

**COUNT II**
**TRADEMARK INFRINGEMENT**
**AND UNFAIR COMPETITION**
**(Against Film Defendants)**

61.     The Conan Doyle Estate incorporates by reference all of the foregoing allegations.

62.     Film Defendants' use of confusingly similar variations of the Conan Doyle Estate's marks in connection with the advertising, sale, offering for sale, distribution, and other exploitation of the motion picture, without the Conan Doyle Estate's permission and consent, has created and will continue to create consumer confusion and a false impression in the minds of the

public that the Conan Doyle Estate is sponsoring or affiliated with Film Defendants, or that the Conan Doyle Estate is associated with or endorsing Film Defendants' movie.

63.     Film Defendants have used marks confusingly similar to the Conan Doyle Estate's federally registered marks in violation of 15 U.S.C. § 1114, and have made false representations, false descriptions, and false designations of origin in violation of 15 U.S.C. § 1125(a).

64.     Film Defendants' activities have caused, and unless enjoined by this Court will continue to cause, a likelihood of confusion and mistake among members of the public and, additionally, injury to the Conan Doyle Estate's goodwill and reputation as symbolized by its common law and federally registered marks, for which the Conan Doyle Estate has no adequate remedy at law.

65.     Film Defendants' actions demonstrate an intentional, willful, and malicious intent to trade on the Conan Doyle Estate's marks and reputation, to cause confusion, mistake, and deception, and to take advantage of the goodwill and public recognition associated with the Conan Doyle Estate's marks for their own commercial advantage, to the Conan Doyle Estate's irreparable injury.

66.     Film Defendants have caused and are likely to continue causing substantial injury to the Conan Doyle Estate and to the public, and the Conan Doyle Estate is entitled to injunctive relief and to recover actual damages, defendants' profits, enhanced profits and damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1114, 1116, and 1117.

## JURY DEMAND

Plaintiff demands a jury trial of all issues triable to a jury in this matter.

## PRAYER FOR RELIEF

WHEREFORE plaintiff prays for relief as follows:

A.        That defendants, their directors, officers, agents, representatives, subsidiaries, and affiliates and all persons acting by, through, or in concert with any of them, be permanently enjoined from:

1) using and infringing the copyrighted expression of plaintiff in any manner, and from reproducing, exhibiting, transmitting, displaying, distributing or preparing derivative works from all copyrighted material in the Copyrighted Stories;

2) using or infringing the Conan Doyle Estate's trademarks, or using any other trademark confusingly similar to the Conan Doyle Estate's trademarks in connection with the marketing, display or distribution of Film Defendants' motion picture and related merchandise;

3) using any false designation of origin or false description which can or is likely to lead the public, or individual members thereof, erroneously to believe either that any book series, motion picture or related merchandise or service was prepared, offered for sale, licensed, sponsored, endorsed, or authorized by the Conan Doyle Estate, when such is not the case; and

4) assisting, aiding, or abetting any other person or entity in engaging in or performing any of the activities referred to in subparagraphs (1)–(3) above;

17

B.      That defendants be required to pay to the Conan Doyle Estate all damages it has sustained as a result of defendants' copyright infringement pursuant to 17 U.S.C. § 504;

C.      That defendants be required to account for and disgorge to the Conan Doyle Estate all gains, profits, and advantages derived from their copyright infringement pursuant to 17 U.S.C. § 504(b);

D.      That defendants be required to pay the Conan Doyle Estate statutory damages and an increase in the award of statutory damages due to defendants' willful infringement pursuant to 17 U.S.C. § 504(c);

E.      That defendants be required to pay the Conan Doyle Estate all such costs and reasonable attorneys' fees as are warranted under 17 U.S.C. § 505;

F.      That Film Defendants be required to pay the Conan Doyle Estate all such damages, profits, enhanced profits and damages, costs, and reasonable attorneys' fees as are warranted under 15 U.S.C. §§ 1114, 1116, and 1117.

G.      That the Court enter judgment for the Conan Doyle Estate and against defendants for all claims, including pre- and post-judgment interest, as allowed by law;

H.      That the Court enter judgment against defendants finding that their unlawful copying of the Copyrighted Stories was and is willful;

I.      That defendants be ordered to pay the Conan Doyle Estate its costs in this action along with reasonable attorneys' fees; and

J.      That the Conan Doyle Estate be granted such other relief as is just and equitable.

Respectfully submitted,

BARDACKE ALLISON LLP

By:     */s/ Benjamin Allison*
        Benjamin Allison
        Justin Miller
        Breanna Contreras
        141 E. Palace Avenue
        Santa Fe, NM 87501
        (505) 995-8000
        (505) 672-7037 (f)
        ben@bardackeallison.com
        justin@bardackeallison.com
        breanna@bardackeallison.com

        *Counsel for Plaintiff Conan Doyle Estate Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

I, Benjamin Allison, hereby certify that I caused a true and correct copy of the foregoing

*First Amended Complaint for Injunction and Damages* to be filed through the Court's CM/ECF

system which caused all parties and counsel entitled to receive notice to be served electronically

as more fully described on the Notice of Electronic Filing.

BARDACKE ALLISON LLP

By:      *Benjamin Allision*
       Benjamin Allison

20