IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| CONAN DOYLE ESTATE LTD., <br><br> Plaintiff, <br><br> v. <br><br> NANCY SPRINGER, PENGUIN RANDOM HOUSE LLC, LEGENDARY PICTURES PRODUCTIONS, LLC, NETFLIX, INC., PCMA MANAGEMENT AND PRODUCTIONS LLC, EH PRODUCTIONS UK LTD., JACK THORNE, and HARRY BRADBEER, <br><br> Defendants. | Case No. 1:20-cv-00610-KG-KK |

**FILM DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**[1]

Pursuant to Federal Rule of Civil Procedure 12(b)(6), defendants Legendary Pictures Productions, LLC ("Legendary"), Netflix, Inc. ("Netflix"), EH Productions UK Ltd. ("EH Productions"), PCMA Management and Productions LLC ("PCMA"), Jack Thorne, and Harry Bradbeer (collectively, the "Film Defendants") move to dismiss plaintiff Conan Doyle Estate Ltd.'s ("Plaintiff") claims against the Film Defendants in their entirety with prejudice.[2]

## I.  INTRODUCTION

Sir Arthur Conan Doyle introduced the now-iconic literary detective Sherlock Holmes to the world over 130 years ago in *A Study In Scarlet*, one of his at least 60 novels and short stories about Holmes. At least 54 of these works – and the Sherlock Holmes character featured in the

---

[1] Plaintiff opposes this motion. Defendants Penguin Random House and Nancy Springer do not oppose the motion. *See* D.N.M. LR-Civ 7.1(a).

[2] The Film Defendants filed a motion to transfer this case to the Central District of California (Dkt. 22), which remains pending.

works – are undeniably in the public domain and thus free for anyone to use. Despite this fact, Plaintiff is doing everything it can – lawful and unlawful – to force third parties to pay Plaintiff for using the public domain Holmes in their own works. In *Klinger v. Conan Doyle Estate, Ltd.*, 761 F.3d 789, 792 (7th Cir. 2014), the Seventh Circuit issued an extraordinary rebuke of Plaintiff's business practices, finding that Plaintiff demanded license fees "for which there is no legal basis, in the hope that the 'rational' writer or publisher asked for the fee will pay it rather than incur a greater cost, in legal expenses, in challenging the legality of the demand." The court called this "a form of extortion," and concluded that it was "time the estate, in its self-interest, changed its business model." *Id.* Plaintiff has not heeded this admonition.

Plaintiff asserts copyright and trademark infringement claims against the Film Defendants for featuring the *public domain character* Sherlock Holmes in its film *Enola Holmes* (the "Film"). Plaintiff claims copyright ownership over plainly unprotectable general characteristics, such as the depiction of warmth and kindness, if expressed in any manner by Sherlock Holmes. But nobody can own such generic characteristics, and this rule applies with equal force when an unprotectable public domain character expresses those uncopyrightable characteristics. Even assuming that Plaintiff could somehow own characteristics like the ones allegedly infringed by the Film, they are not original to the purportedly copyrighted stories and thus are in the public domain.

Plaintiff's attempt to use trademark law to accomplish what copyright law cannot is similarly meritless. The First Amendment protects the Film's title under the test set forth in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), which has become the constitutional threshold across the country for trademark claims asserted against expressive works. Plaintiff's trademark

claim independently fails because the U.S. Supreme Court has expressly rejected the use of trademark law to create a *de facto* perpetual copyright, as Plaintiff is attempting here. *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003).

As in *Klinger*, this Court should reject Plaintiff's attempt to extort publishers, producers, and content creators who use the public domain character Sherlock Holmes, and should dismiss the claims against the Film Defendants with prejudice.

## II. FACTUAL BACKGROUND

### A. Conan Doyle's Works

From 1887 to 1927, Sir Arthur Conan Doyle wrote at least 60 works featuring Sherlock Holmes and his partner Dr. Watson. First Amended Complaint ("FAC") ¶ 17.[3] It is undisputed that nearly all of these works (at least 54 of them) have fallen into the public domain in the United States. *See id.* ¶¶ 17-18; Dkt. 28 at 4. Plaintiff purports to own the copyrights to the last ten stories about Sherlock Holmes (the "Allegedly Protected Stories").[4]

### B. The Book Series

Defendant Nancy Springer wrote the six-book series *The Enola Holmes Mysteries* (the "Book Series"). The Book Series follows its titular character, Sherlock Holmes' sister Enola Holmes – a character entirely new to the Book Series and not found in any Conan Doyle work.

---

[3] Beyond the sixty works alleged in the complaint, FAC ¶ 17, Conan Doyle also wrote or co-wrote other works featuring Holmes, including an 1899 play in which Sherlock Holmes falls in love and gets married. *See* https://en.wikipedia.org/wiki/Sherlock_Holmes_(play).

[4] The FAC confusingly calls Conan Doyle's final ten stories "the Copyrighted Stories" (*see* FAC ¶ 18), even though Plaintiff concedes that the following four stories are in the public domain: *The Creeping Man* (1923); *The Sussex Vampire* (1924); *The Three Garridebs* (1924); and *The Illustrious Client* (1924). *See* Dkt. 28 at 4.

The Book Series was published between 2006 and 2010 by an imprint owned by defendant Penguin Random House.  *See* FAC ¶ 28.

### C.     The Film

The Film is adapted from the Book Series' first installment.  *See* FAC ¶ 37.  Defendants Legendary, PCMA, and EH Productions produced the Film, defendant Harry Bradbeer directed the Film, and defendant Jack Thorne wrote the screenplay.  *Id.* ¶¶ 8-13.  On September 23, 2020, Netflix released the Film.  *See* FAC ¶¶ 9, 37; Freeman Decl. ¶ 3.  The Film opens with Enola Holmes waking on her sixteenth birthday to learn that her mother has disappeared.  *See* Freeman Decl., Ex. 1.[5]  Her brothers Mycroft and Sherlock Holmes, whom Enola has not seen in years, come to visit Enola to determine her future.  Mycroft conspires to send her to a finishing school, but Enola escapes.  Adventures abound while Enola searches for her mother in London, all the while thwarting Mycroft's attempts to catch her.  During this time, Enola also befriends a young runaway viscount and helps him escape an attempt on his life and uncover his would-be murderers.  At the end of the film, Sherlock learns that Enola has solved the case of the viscount before he had it figured out, and the movie ends with Enola declaring: "I am a detective.  I am a decipherer.  And I am a finder of lost souls.  My life is my own, and the future is up to us."  *Id.* at 1:56:07.  The Film is two hours long, with approximately 20 minutes of scenes with Sherlock.

### D.     This Lawsuit

Plaintiff filed this lawsuit on June 23, 2020 – three months before the Film's release, and more than a decade after the Book Series' initial publication.  While the FAC acknowledges that

---

[5] The Film is available to Netflix subscribers at https://netflix.com/enolaholmes.  The Film Defendants are lodging a DVD of the Film as Exhibit 1 to the Freeman Declaration.  As explained in Section III, the Court may consider the Film in deciding this motion.

"the world is free to use and adapt the characters as Conan Doyle created and developed them in his public domain Sherlock Holmes stories" (FAC ¶ 3), it asserts ownership over a number of personality traits that it (falsely) contends first appeared in the Allegedly Protected Stories.

Specifically, Plaintiff alleges that in the Allegedly Protected Stories, Holmes developed "human connection and empathy" (FAC ¶ 21), and became "warmer," "capable of friendship," and "could express emotion" (*id.* ¶ 22) (collectively, the "Emotion Trait"). Plaintiff also alleges that Holmes "began to respect women" (*id.* ¶ 22) and, in one instance, reacted with "warmth and emotion" to a woman (*id.* ¶ 24) (the "Respect Trait").[6] Plaintiff alleges that it owns several other elements, such as a friendship between Holmes and Watson (*id.* ¶ 23) and a "great interest" in dogs (*id.* ¶ 26), but these other traits are not in the Film and thus are irrelevant to this motion.

Plaintiff also asserts one claim for trademark infringement and unfair competition alleging that the Film's title infringes Plaintiff's (a) purported registered trademarks in "SHERLOCK HOLMES" for "cultural, educational, and entertainment exhibitions," "electronic gaming machines," and clothing, and a logo of Sherlock Holmes with a pipe for "books and short stories in the field of detective fiction" (FAC ¶¶ 43, 45); and (b) alleged common law trademarks in "HOLMES," "MR. HOLMES," "SHERLOCK HOLMES," and "HOLMES AND WATSON" (*id.* ¶¶ 42, 44-45). The Film Defendants now move to dismiss the FAC with prejudice.

### III.  THE COURT MAY CONSIDER THE WORKS AT ISSUE IN CONNECTION WITH A MOTION TO DISMISS

To survive a motion to dismiss, a plaintiff must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662,

---

[6] For purposes of this motion, we will assume that the Emotion Trait and Respect Trait are in the Film.

678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In considering the Film Defendants' motion, the Court may consider additional material that is "referred to in the complaint and is central to the plaintiff's claim." *GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1384 (10th Cir. 1997) (collecting cases). This includes the works that form the basis of the plaintiff's copyright or trademark infringement claims. *See Clark v. Dashner*, No. 1:14-cv-00965 KG/KK, 2016 WL 3621274, at *3 (D.N.M. June 30, 2016) (finding that courts routinely examine the works at issue in considering motions to dismiss; collecting cases).[7]

In deciding this motion, the Court may consider the Film, the Conan Doyle works that are in the public domain (the "Public Domain Works"), and the Allegedly Protected Stories. All of these works are incorporated by reference into the FAC, they form the basis of Plaintiff's claims against the Film Defendants, and no party can reasonably question their authenticity. *See* FAC ¶¶ 3 (alleging that the Allegedly Protected Stories featured elements that were not in the Public Domain Works); 19-20 (allegations regarding the Public Domain Works); 21-26 (allegations regarding the Allegedly Protected Stories); 37-38 (allegations regarding the Film).

## IV. PLAINTIFF'S COPYRIGHT INFRINGEMENT CLAIM FAILS

### A. Only the Emotion Trait and Respect Trait Are Relevant Here

As an initial matter, only the Emotion Trait and the Respect Trait are at issue in this motion. The remaining allegedly protectable elements identified in the FAC (*see* FAC ¶¶ 21-26) are not actually in the Film. Specifically:

---

[7] *See also Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1128 (C.D. Cal. 2007) (considering episodes of defendants' television series); *DiTocco v. Riordan*, 815 F. Supp. 2d 655, 658 n.2 (S.D.N.Y. 2011) (considering plaintiff's books and defendants' books and movie); *Randolph v. Dimension Films*, 630 F. Supp. 2d 741, 744 (S.D. Tex. 2009) (considering plaintiff's book and defendants' movie).

- Dr. Watson is not even a character in the Film. Accordingly, the Film does not develop Watson's relationship with Sherlock Holmes (FAC ¶¶ 23, 34) and Watson does not remarry in the Film (*id.* ¶ 26).

- The Film does not show Sherlock interacting with dogs, and accordingly, does not demonstrate any "great interest" in dogs by Sherlock. FAC ¶ 26.

- There are no scenes in which Sherlock "embrace[s] modern technologies" or "use[s] them in detective work." *Id.*

To the extent Plaintiff's claims are premised on these allegations, they necessarily fail.[8] Plaintiff's copyright claims are thus limited to the Emotion Trait and the Respect Trait, but the claims still fail because these traits are not, standing alone, copyrightable and, in any event, are not original to the Allegedly Protected Stories.

### B. The Emotion Trait and Respect Trait Are Not Copyrightable

There is no dispute that Plaintiff may own protectable expression in works that still enjoy copyright protection in the United States. But Plaintiff's claim is not based on protectable expression in any copyrighted work. Instead, Plaintiff contends that it owns generic, amorphous characteristics – like emotion or kindness – regardless of whether the expression of those characteristics is similar in any manner to the expression in the Allegedly Protected Stories. This theory contradicts well-established copyright law.

---

[8] To be clear, the Film Defendants do not concede that these other elements are protectable. For example, Plaintiff alleges that Sherlock and Watson's friendship was developed no later than in Conan Doyle's 1924 story *The Three Garridebs*, which entered the public domain on January 1, 2020 – more than nine months before the Film's release. FAC ¶ 31.

It is a "fundamental tenet" of copyright law that "protection extends only to the author's original expression and not to the ideas embodied in that expression." *Gates Rubber Co. v. Bando Chem. Indus.*, 9 F.3d 823, 836 (10th Cir. 1993). *See also* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work for authorship extend to any idea … [or] concept … regardless of the form in which it is described, explained, illustrated, or embodied in such work"). As the Tenth Circuit has explained, courts "must separate unprotected ideas from expression" because copyright law only protects "the '*particularized expression*' of [an] idea," and not the idea itself. *Blehm v. Jacobs*, 702 F.3d 1193, 1201, 1205 (10th Cir. 2012) (emphasis added). *See also Golan v. Gonzalez*, 501 F.3d 1179, 1184 (10th Cir. 2007) (original expression in the literary context "refers to the particular pattern of words … that comprise a work").

This principle applies equally to the expression of general feelings, emotions, and other personality traits, which constitute unprotectable ideas. *See, e.g., Daniels v. Walt Disney Co.*, 958 F.3d 767, 772 (9th Cir. 2020) (explaining that "the 'idea' of an emotion" is not copyrightable); *Campbell v. Walt Disney Co.*, 718 F. Supp. 2d 1108, 1115 (N.D. Cal. 2010) (characters' "cocky attitude" was generic and unprotectable); *Shame on You Prods. v. Banks*, 120 F. Supp. 3d 1123, 1166 (C.D. Cal. 2015) (being "nice" was "not a protectable character trait"), *aff'd*, 690 F. App'x 519 (9th Cir. 2017); *Whitehead v. Paramount Pictures Corp.*, 53 F. Supp. 2d 38, 48 (D.D.C. 1999) (general traits like "intelligence, aggressiveness, paranoia and athleticism" were not copyrightable), *aff'd sub nom. Whitehead v. Paramount Picture Cop.*, 2000 WL 33363291 (D.C. Cir. Apr. 19, 2000); *Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 845 n.24 (C.D. Cal. 2010) (character traits of "young, attractive, and sarcastic" were not protectable), *aff'd* 438 F. Appx. 587 (9th Cir. 2011).

Notably, at least one court has specifically addressed the scope of copyright protection for contributions to a public domain character in a copyrighted work.  In *Silverman v. CBS Inc.*, 870 F.2d 40 (2d Cir. 1989), the Second Circuit explained that copyrights "provide protection only for the increments of *expression*" contributed to a public domain character in a copyrighted work.  *Id.* at 49-50 (emphasis added).  *See also id.* at 50 (referring to "*protectable* increments") (emphasis added).  The *Silverman* court specifically held that the declaratory relief plaintiff was free to use the public domain characters Amos 'n' Andy "up to the point at which he copies original expression" from the copyrighted works.  *Id.*

In this case, even if the Emotion Trait and Respect Trait were original to copyright protected works, which they are not, they are unprotectable ideas.  Copyright law does not allow the ownership of generic concepts like warmth, kindness, empathy, or respect, even as expressed by a public domain character – which, of course, belongs to the *public*, not Plaintiff.  *See Golan*, 501 F.3d at 1192 ("[C]opyright law bears out the rather obvious – but significant – point that works in the public domain belong to the public").  Plaintiff's copyright claim fails for this reason alone.

### C. The Emotion Trait and Respect Trait Are In The Public Domain Works

Even if amorphous characteristics were copyrightable, which they are not, the Emotion Trait and Respect Trait are in public domain works, and thus are free to be used in the Film.

#### 1. The Emotion Trait

While the FAC alleges that Holmes first expressed the Emotion Trait in the Allegedly Protected Stories, FAC ¶ 22, this is untrue.  Indeed, the FAC expressly alleges that the Emotion Trait was "created" in *The Three Garridebs*, which entered the public domain on January 1,

2020, nine months before the Film's release.  *See* FAC ¶ 31 (quoting a passage in which Watson notes that his gunshot wound was worth it "to know the depth of loyalty and love which lay behind that cold mask….  For the one and only time I caught a glimpse of a great heart as well as a great brain."); Freeman Decl., Ex. 2 at 104.[9]  This on its own should end the inquiry, but other examples of the Emotion Trait abound in the Public Domain Works:

- In *The Blue Carbuncle* (1892), Holmes solves a case on the day after Christmas, but the criminal pleads with Holmes to let him go.  Sherlock shows mercy and lets the criminal free, explaining to Watson that "I suppose that I am commuting a felony, but it is just possible that I am saving a soul."  Holmes noted that "it is the season of forgiveness."  Freeman Decl., Ex. 3 at 9-10.

- In *The Hound of the Baskervilles* (1902), when Holmes discovers that a body was not the person they had feared, Watson writes that Holmes "uttered a cry and bent over the body.  Now he was dancing and laughing and wringing my hand.  Could this be my stern, self-contained friend?  These were hidden fires, indeed!"  Freeman Decl., Ex. 7 at 58.

- In *The Solitary Cyclist* (1903), Holmes goes to ensure that a woman he was advising was safe.  When he sees that she had disappeared, Watson writes, "he halted, and I saw him throw up his hand with a gesture of grief and despair."  Holmes cries, "Too late, Watson, too late!"  Freeman Decl., Ex. 8 at 6.

---

[9] The Film Defendants have lodged a copy of *The Casebook of Sherlock Holmes*, which includes all ten of the Allegedly Protected Stories, as Exhibit 2 to the Freeman Declaration.  *See* Dkt. 28 at 3-4.  All parties have consented to the Film Defendants' submission of more than fifty pages of exhibits.  *See* D.N.M. LR-Civ 10.5.

- In *The Six Napoleons* (1904), Holmes receives applause for a discovery, and Watson writes, "A flush of colour sprang to Holmes's pale cheeks, and he bowed to us like the master dramatist who receives the homage of his audience." Watson noted that Holmes "was capable of being moved to its depths by spontaneous wonder and praise from a friend." Freeman Decl., Ex. 9 at 9.

- In *The Red Circle* (1911), a landlady recounts how Sherlock assisted a tenant of hers, explaining that "he would never cease talking about it – your kindness, sir, and the way in which you brought light into the darkness." Freeman Decl., Ex. 10 at 3. In that same story, Watson describes Holmes as being "accessible upon the side of flattery, and also, to do him justice, upon the side of kindliness." *Id.*

Because the Emotion Trait is found in Public Domain Works, it is free for use by the Film Defendants, and cannot form the basis of a copyright infringement claim.

### 2. The Respect Trait

The FAC alleges that Holmes first began to respect women in the Allegedly Protected Stories, FAC ¶ 22, and that, in the Public Domains Works, Holmes exhibited only "indifference, or even actual aversion to women," FAC ¶ 24. This is untrue.

In *The Copper Beeches* (1892), for example, Holmes shows nothing but kindness and respect to a woman who seeks his counsel. Freeman Decl., Ex. 6. In that story, a woman named Violet Hunter comes to Baker Street, and Holmes asks her to take a seat and offers to "do anything that I can to serve you." *Id.* at 2. Watson writes that he "could see that Holmes was favourably impressed by the manner and speech of his new client." *Id.* When Hunter explains a lucrative but potentially dangerous job opportunity, Holmes responds, "I confess that it is not the

situation which I should like to see a sister of mine apply for." *Id.* at 4. When she decides to accept the position, Holmes assures her that "at any time, day or night, a telegram would bring me down to your help." *Id.* Near the end of the story, Holmes tells Hunter that she was "very brave," and that he needed her to perform "one more feat" that he would not ask of her "if I did not think you a quite exceptional woman." *Id.* at 9.

Similarly, in *The Illustrious Client* (1924), someone warns Holmes not to get involved in a case in which a client asked him to convince a young woman not to marry a man with a murderous past. Watson says to Holmes, "Must you interfere? Does it really matter if he marries the girl?" Holmes responds that "it mattered very much." Holmes later explains, "I was sorry for her, Watson. I thought of her for the moment as I would have thought of a daughter of my own," and that he pleaded with her "with all the warmth of words that I could find in my nature." Freeman Decl., Ex. 2 at 9, 12. As another example, in *The Noble Bachelor* (1892), Holmes requests that his client "take a lenient view" of his former fiancé, who fled before following through with the wedding, admonishing that "[y]ou must make allowance for this poor girl, placed in so unprecedented a position." Freeman Decl., Ex. 5 at 8. And in *The Speckled Band* (1892), Holmes attempts to calm a frightened woman: "'You must not fear,' said he soothingly, bending forward and patting her forearm, 'We shall soon set matters right, I have no doubt.'" Freeman Decl., Ex. 4 at 1.

These examples disprove Plaintiff's contention that Holmes *only* expressed indifference or aversion to women in the Public Domain Works. FAC ¶ 24. Because the Respect Trait is found in Public Domain Works, it cannot form the basis of a copyright infringement claim.

V.     **PLAINTIFF'S TRADEMARK INFRINGEMENT CLAIM FAILS**

Plaintiff also contends that the Film's title infringes Plaintiff's purported trademarks because it contains the word "Holmes," *See* FAC ¶¶ 42-45, but this theory contradicts well-established constitutional principles and U.S. Supreme Court precedent.

A.     **The *Rogers* Test Mandates Dismissal of the Trademark Claim**

Trademark infringement claims typically are governed by a likelihood-of-confusion test. But when the allegedly infringing use is in an expressive work – and especially when the use is in an expressive work's title – courts "instead apply a test developed by the Second Circuit in *Rogers v. Grimaldi*." *Twentieth Century Fox Television v. Empire Distribution*, 875 F.3d 1192, 1196 (9th Cir. 2017) (applying the *Rogers* test to allegedly infringing title of television series).

In *Rogers*, the iconic entertainer Ginger Rogers brought Lanham Act and other claims against the producers of the film *Ginger and Fred*. *Rogers*, 875 F.2d at 996. Despite the title, the story was not about Rogers and Fred Astaire, but instead about fictional cabaret performers who become known in Italy as "Ginger and Fred." *Id.* at 996-997. The court warned that the "overextension of Lanham Act restrictions in the area of titles might intrude on First Amendment values," and concluded that titles required "more protection than the labeling of ordinary commercial products." *Id.* at 998. To ensure this protection, the court instructed that the First Amendment would defeat Rogers' Lanham Act claim unless (1) "the title has no artistic relevance to the underlying work whatsoever," or (2) "the title explicitly misleads as to the source or the content of the work." *Id.* at 999. Applying this two-part test, the court rejected the Lanham Act claim because the title surpassed the "minimum threshold of artistic relevance to the film's content" and did not contain an "overt claim" that Rogers endorsed the film. *Id.* at 1001.

Courts have provided two rationales for treating expressive works differently than ordinary consumer products: (1) expressive works "implicate the First Amendment right of free speech"; and (2) "consumers are less likely to mistake the use of someone else's mark in an expressive work for a sign of association, authorship, or endorsement." *Empire*, 875 F.3d at 1196 (citing *Rogers*, 875 F.2d at 997-1000).

The Second Circuit's *Rogers* test has since been adopted by courts across the country. *See Westchester Media v. PRL USA Holdings*, 214 F.3d 658, 664-665 (5th Cir. 2000) (applying *Rogers* test in Lanham Act claim involving title of magazine); *ETW Corp. v. Jireh Publishing, Inc.*, 332 F.3d 915, 928 (6th Cir. 2003) (applying *Rogers*); *Empire*, 875 F.3d at 1197 (9th Cir.) (same); *Univ. of Ala. v. New Life Art*, 683 F.3d 1266, 1278 (11th Cir. 2012) (expressing "no hesitation in joining our sister courts by holding that we should construe the Lanham Act narrowly when deciding whether an artistically expressive work infringes a trademark," and applying *Rogers*).[10]  Courts routinely apply the *Rogers* test at the motion-to-dismiss stage. *See, e.g., Brown v. Elec. Arts*, 724 F.3d 1235, 1247-1248 (9th Cir. 2013) (affirming dismissal under *Rogers* test); *Louis Vuitton Malletier S.A. v. Warner Bros. Entm't Inc.*, 868 F. Supp. 2d 172, 184 (S.D.N.Y. 2012) (applying *Rogers* test and dismissing complaint); *Fortres Grand Corp. v. Warner Bros. Entm't*, 947 F. Supp. 2d 922, 934 (N.D. Ind. 2013) (same), *aff'd on other grounds*, 763 F.3d 696 (7th Cir. 2014); *Sporting Times, LLC v. Orion Pictures, Corp.*, 291 F. Supp. 3d 817, 825-826 (W.D. Ky. 2017) (same).

---

[10] The Tenth Circuit has not decided, one way or the other, whether to join these other Circuits in applying *Rogers* to trademark infringement claims involving expressive works.

Here, the Film is an expressive work entitled to full First Amendment protection.  *See, e.g.*, *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 65 (1981) ("Entertainment, as well as political and ideological speech, is protected; motion pictures … fall within the First Amendment guarantee.").  Under *Rogers*, the First Amendment bars Plaintiff's trademark and unfair-competition claim because the Film's title has artistic relevance to the Film and does not explicitly mislead as to any connection or affiliation with Plaintiff.

### 1. The Film's Title Has Artistic Relevance to the Film

For this assessment, the "bar is set low: the level of relevance merely must be above zero."  *Empire*, 875 F.3d at 1198 (internal quotation marks omitted).  *See also Rogers*, 875 F.2d at 1001 (holding that the film's title was "not arbitrarily chosen").  In this case, "Holmes" in the Film's title refers to the titular character, Enola Holmes.  *See* FAC ¶ 27.  The title *Enola Holmes* clearly has artistic relevance to a film about its main character Enola Holmes.

### 2. The Film's Title Does Not Explicitly Mislead the Public

The Film's title does not "explicitly mislead[] as to the source or content of the work."  *Rogers*, 875 F.2d at 999.  To "explicitly mislead" in this context, the defendant must have made an "explicit indication" that the plaintiff endorsed or was involved with the work.  *Id.* at 1001 ("The title 'Ginger and Fred' contains no explicit indication that Rogers endorsed the film or had a role in producing it").  A defendant's use of the plaintiff's mark itself – here, per Plaintiff's allegations, "HOLMES" (FAC ¶ 45) – cannot be explicitly misleading on its own.  *See, e.g.*, *Mattel v. MCA Records*, 296 F.3d 894, 902 (9th Cir. 2002) (explaining that if use of the alleged mark alone were sufficient to expressly mislead, "it would render *Rogers* a nullity").

Here, Plaintiff has not alleged – nor could it plausibly allege – that the Film explicitly misleads consumers about the source or content of the work. The Film's title does not include any mention of Conan Doyle Estate Ltd. To the contrary, the Film's opening credits make clear that the Film is "a Legendary Pictures production" and "a PCMA production." Freeman Decl., Ex. 1 at 00:29-00:33. And the end credits note that the Film is "[b]ased upon the Enola Holmes Mystery book 'The Case of the Missing Marquess, An Enola Holmes Mystery' by Nancy Springer." *Id.* at 1:57:00. The Film does not mention Plaintiff at any point, and does not make any explicit indication that Plaintiff created or endorsed the Film.

Because the Film is an expressive work, its title has artistic relevance, and there is no plausible allegation that the Film Defendants explicitly misled the public about the source or content of the Film, the First Amendment requires dismissal of Plaintiff's trademark and unfair-competition claim under the *Rogers* test.

### B. Plaintiff Cannot Circumvent Copyright Terms with Trademark Claims

Plaintiff attempts to use trademark law to extend protection of Sherlock Holmes beyond the period allowed under copyright law, but the U.S. Supreme Court has squarely rejected a similar strategy.

In *Dastar v. Twentieth Century Fox*, a production company (Dastar) repackaged public domain content originally produced by a studio (Fox). Dastar then distributed the content under its own name – identifying itself as the producer and distributor, and its employees as executive producer, producer, and associate producer – with no mention of Fox. 539 U.S. at 26-27. Fox asserted a claim under the Lanham Act, contending that Dastar made a "false designation of origin," which was likely to cause confusion as to the origin of its goods, because Dastar did not

actually produce the content that Dastar was selling under its name. *Id.* at 31. The district court and circuit court found in favor of Fox on the trademark claim, but the Supreme Court reversed. *Id.* at 28, 38. The high court explained that the rights of copyright owners are "part of a carefully crafted bargain," and that recognizing a Lanham Act claim stemming from the use of a public domain work would "be akin to finding that [trademark law] created a species of perpetual patent and copyright, which Congress may not do." *Id.* at 37. *Accord Comedy III Prods. v. New Line Cinema*, 200 F.3d 593, 595 (9th Cir. 2000) (holding that "the Lanham Act cannot be used to circumvent copyright law. If material covered by copyright law has passed into the public domain, it cannot then be protected by the Lanham Act without rendering the Copyright Act a nullity"); *Miller v. Pixar Animation Studios*, No. C 02-04748 JW, 2005 WL 8177637, at *6 (N.D. Cal. May 2, 2005) (rejecting plaintiff's "Lanham Act claim regarding [a character that] passed into the public domain over forty years ago" for same reasons).

Here, Plaintiff attempts to use trademark law to do what copyright law can no longer do: prevent others from freely using and adapting Sherlock Holmes in their own works. But this is not the function of trademark law. Allowing Plaintiff to prevent the creation of new works featuring public domain material runs contrary to the "carefully crafted bargain" embodied in copyright law, and Plaintiff's attempt to create a perpetual copyright should be rejected.

## VI.   CONCLUSION

The character Sherlock Holmes, as expressed in more than fifty works across the decades, has fallen into the public domain and now belongs to the public. Plaintiff has not plausibly alleged that the Film copies any protectable expression that Plaintiff owns, nor has it plausibly alleged that the Film infringes any purported trademark that it owns. Accordingly, the

Film Defendants respectfully request that the Court grant this motion and dismiss Plaintiff's claims against them with prejudice.[11]  The Film Defendants further request that the Court award them their reasonable attorneys' fees pursuant to 17 U.S.C. § 505 (copyright) and 15 U.S.C. § 1117 (trademark), in an amount to be determined by subsequent motion.

Date: October 30, 2020

DAVIS WRIGHT TREMAINE LLP

By: /s/ Nicolas A. Jampol
Nicolas A. Jampol (CA Bar No. 244867)
Cydney Swofford Freeman (CA Bar No. 315766)
Camila Pedraza (CA Bar No. 329984)
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone:  (213) 633-6800
Email: nicolasjampol@dwt.com
cydneyfreeman@dwt.com
camilapedraza@dwt.com

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.
Charles K. Purcell
Post Office Box 1888
Albuquerque, NM 87103
Tel:   (505) 765-5900
Email: kpurcell@rodey.com

*Attorneys for Defendants Legendary Pictures Productions, LLC, Netflix, Inc., PCMA Management and Productions LLC, EH Productions UK Ltd., Jack Thorne, and Harry Bradbeer*

---

[11] Dismissal should be ordered with prejudice when amendment would be futile.  *Knight v. Mooring Capital Fund*, 749 F.3d 1180, 1190 (10th Cir. 2014).

## CERTIFICATE OF SERVICE

I, Nicolas A. Jampol, hereby certify that I caused a true and correct copy of the foregoing *Film Defendants' Motion to Dismiss First Amended Complaint* to be filed through the Court's CM/ECF system which caused all parties and counsel entitled to receive notice to be served electronically as more fully described on the Notice of Electronic Filing.

DAVIS WRIGHT TREMAINE LLP

By: /s/ Nicolas A. Jampol
    Nicolas A. Jampol